**STATE of Tennessee, Appellee,**

v.

**Sherman DRIVER and Gilbert Ray "Cotton" Graves, Appellants.**

**No. 80–195–III.**

Court of Criminal Appeals of Tennessee, at Nashville.

July 8, 1981.

Permission to Appeal Denied by the Supreme Court Sept. 28, 1981.

James A. Delanis, Asst. Atty. Gen., Nashville, Ray Whitley, Wayne Hyatt, Asst. Dist. Attys. Gen., Gallatin, for appellee.

John Wesley Jones, Gallatin, for appellant Driver.

William P. Redick, Jr., Lionel R. Barrett, Jr., Nashville, for appellant Graves (on appeal).

Michael Edwards, Ron Buchanan, Hendersonville, for appellant Graves (at trial).

## OPINION

DAUGHTREY, Judge.

Sherman Driver and Gilbert Ray "Cotton" Graves appeal from convictions for involuntary manslaughter and second degree murder, respectively. The jury fixed Driver's punishment at not less than two nor more than five years imprisonment, and Graves' at twenty-five years imprisonment. Both defendants challenge the sufficiency of the evidence and claim that the corpus delicti was insufficiently established to permit the introduction of various inculpatory statements. Graves also urges that the trial court erred in allowing the State to introduce photographs of the bones of the deceased victim.

Victim Renita Wright, 15, left her home in Lebanon, Tennessee early on Friday evening, August 6, 1976, in the company of her 18-year old sister, Billie, and family friend John Robert Lackey. The trio were ostensibly headed for a fair in Lebanon, and Renita Wright's mother had given her permission to stay out until 11:30 P.M. Renita wore plaid jeans, a beige shirt, and a costume jewelry birthstone ring and was barefoot.

Instead of going to the fair, however, at Billie's suggestion the three young people went to the Rainbow Club in Wilson County. They met a number of people outside the Club, including an old boyfriend of Billie's and defendant Sherman Driver. After Driver secured the underaged Renita's entrance to the Club, everyone went in and the two young women separated from Lackey at this point. Driver shared a bottle of liquor and some marijuana with them and danced with Renita. After a while, Renita told her sister that she and Driver were going outside to "smoke a joint."

Approximately half an hour later, Billie went outside to see what had become of Renita. After a thorough search outside the Club and in the restrooms, she concluded that her sister must have left the Club. Billie looked several times more, but she never saw Renita again.

Mrs. Wright "waited up" for her two daughters until 5:00 A.M. on Saturday morning, August 7, 1976, before she finally went to bed. Billie arrived home around 7:00 or 8:00 A.M. and told her parents that she and Renita had "been out to the lake that night." Billie said that Renita had "left with somebody else." She described Driver but did not name him (although she knew his name).

Because Renita had run away from home overnight on several prior occasions and had come home voluntarily the next day in each instance, her parents and sister expected her to return later in the day. When she did not, Billie became concerned and went with Lackey to Hartsville to speak to her former boyfriend, Kirby Moore. She asked Moore where Driver, the person she had last seen with her sister, lived. Moore told her that Driver lived in Westmoreland. Billie and Lackey then drove to Westmoreland and attempted, without success, to locate Driver.

On Sunday afternoon, August 8, 1976, Renita's parents filed a missing persons report with the Lebanon police. The parents offered a substantial reward for information leading them to their daughter, and over the next two years they journeyed to several states in the course of following up various leads.

In the meantime, several weeks after Renita's disappearance, Billie returned to the Rainbow Club, where she saw Driver. She asked him three times "if he knew where Nita was or what he did with Nita," but "[h]e didn't pay any attention to [her]."

On March 5, 1977, TBI agent Frank Evetts, Wilson County Chief Deputy Sheriff Al Cook, and Westmoreland city police officer George Day went to the Traveller's Rest tavern in Westmoreland. The men had Renita Wright's picture and "were attempting to locate Sherman Driver or any possible person that had seen the two together" on the night in question.

Gilbert Ray "Cotton" Graves was Driver's uncle, and the two men were known to "run together." Day entered the tavern, found Graves and sent him outside to talk to the two officers. Graves was not a suspect at this point. When Graves emerged from the tavern, he was "belligerent" and "hostile," and he "wanted to know what in hell [the officers] wanted with him." Evetts showed Graves Renita Wright's picture and asked him "if he had ever seen this girl or knew her." According to the testimony of both Evetts and Cook, Graves replied "Yeah, I know her; she's laying down there in the hollow, dead." Evetts told Graves to calm down, after which Graves denied having ever seen Renita Wright. When asked if he had seen her with Driver, Graves said "what Sherman Driver did was none of his [Graves'] damn business." The officers said that they "didn't think much about it [Graves' statement] at that time."

The next month, in April, 1977, agent Evetts contacted Driver on three or four occasions. Driver told him that he had driven in his car to the Rainbow Club on the night in question, with Kirby Moore and several other men. Upon arriving he met Billie and Renita Wright. They all went into the Club and danced. He and Renita later went outside to check on one of Driver's friends, who had become overly intoxicated. Driver stated that he and Renita got into his car and talked, he in the front seat and she in the back. A law enforcement officer approached, told Driver he was "too drunk to be there," and asked him to leave. Driver told Evetts that Renita then got out of the car and joined a group of people gathered at a blue or green Chevrolet, and he (Driver) departed.

The police at this point apparently asked Driver to submit to a polygraph test. Driver was driven by one Herschel Williams to Lebanon, where he was to join law enforcement officers Evetts and Cook for the trip to Nashville to take the test. Williams was a co-worker of Driver, and he knew both

Driver and Graves. On the way to Lebanon, Driver told Williams that "he had to smoke some marijuana, [because] he couldn't afford to tell the truth" during the polygraph session. Driver smoked three marijuana cigarettes and drank one beer before the two men met Evetts and Cook.

All four men then drove to Nashville, where TBI polygraph examiner Floyd Mangrum administered a polygraph test on Driver. At trial, Mangrum was examined out of the presence of the jury concerning the examination. He testified that Driver was asked whether he had harmed Renita Wright, whether he knew where she was, and whether he had killed her. According to Mangrum, Driver's negative answers to those questions showed "no specific responses," indicating that "he was telling the truth."

After the group's return to Lebanon, Williams and Driver re-entered Williams' pick-up truck and went drinking in Westmoreland. Williams testified that Driver was exuberant, "laughing and [saying] that he beat the lie detector test."

The next day, while the two men were working, Williams asked Driver why he had been asked to take the test and what he had to do with Renita Wright's disappearance. Williams related Driver's response as follows:

> Then he told me that he had met the girl and she had been in the car with him and he come back to Westmoreland and met some friends and he got out of the car.
>
> \*    \*    \*    \*    \*    \*
>
> He said that he smacked the girl because she wouldn't have sex with all three of them and he got out of the car and didn't know what happened to the girl after then.

When Williams asked Driver what happened when he met these friends, Driver replied that "they went to a hollow."

A few days later, Williams was working with both Driver and Graves. The men were discussing how Driver had "beaten" the polygraph test. Williams heard Driver ask Graves "what happened to the girl after

he got out." Graves replied that he "didn't know anything about it and didn't want to hear anything about it."

Williams also testified that, at Driver's suggestion, the two men went mushroom hunting in a remote area in Sumner County known as Bear Carr Hollow. Driver also suggested that they hunt in opposite directions; the two men looked for mushrooms for some one to two hours.

No new leads developed in the search for Renita Wright until Thanksgiving Day, November 22, 1979. On that date Grant Carter and five friends were deer hunting in Bear Carr Hollow. While walking along a gravel road cut through the forest, Carter spied a human skull lying on top of the ground about two feet from the road. The lower jaw bone was missing. Carter summoned his companions, and they brought the skull to the Westmoreland police department.

A group of law enforcement officers and citizens, including Grant Carter, travelled to Bear Carr Hollow two days later, and conducted a "grid pattern" search of the area surrounding the spot where the skull had been found. Thirty-five to forty feet from that spot a mass of bones was found. These bones, along with the skull, were brought for identification and analysis to Dr. William Bass, a University of Tennessee at Knoxville forensic anthropologist and member of the State Medical Examiner's Staff. Dr. Bass identified all of the bones except the skull as animal bones, having belonged to a pig, a goat, and two domestic dogs.

The officers resumed and expanded the search on November 27, 1979, and found a mass of human bones and what appeared to be a human lower jaw some one hundred seven feet from the location of the skull found by Carter. A tattered scrap of material with buttons on it which appeared to be the remnant of a blouse was recovered, as was a small ring.

Dr. Bass was able to estimate from the bones recovered that the individual had been a white female, 14 to 17 years of age. Through dental charts, Dr. Bass determined

that the jaw and skull were those of Renita Wright. It was theorized that the bones had been scattered by dogs, but the cause of death could not be determined. The body had not been buried. The ring was identified by Renita's mother as the ring Renita was wearing on the night of her disappearance. The mass of bones and the skull were recovered in the hollow some 31.7 miles from the Rainbow Club and some 3.5 to 3.7 miles from the defendants' residences. According to Dr. Bass, the remains had been there for a period of time not less than four to five months and not more than four to five years.

On December 6, 1979, Driver was asked by Sumner County Sheriff's deputies to come to the office of Lieutenant George Farmer for questioning in the Wright case. *Miranda* warnings were immediately administered, and Driver was interrogated from 5:30 P.M. until the early morning hours, between 1:00 and 3:00 A.M., of December 7, 1979. The first version given by Driver of the events of August 6, 1976, substantially paralleled his statements given previously in April, 1977.

The second story told by Driver on December 6, 1979, differed a great deal from earlier accounts. In this version, Driver said that he was asked to leave the Rainbow Club due to his intoxicated condition. He did so, bought gasoline for his car, came back to the Club, and asked Larry Warner Scruggs to drive him to Westmoreland. The two men asked Renita Wright to accompany them, which she did. Driver stated that he passed out and woke up the next morning in his car, which was parked in front of his grandfather's house.

In Driver's third account that evening to police, he stated once again that Larry Scruggs drove Renita Wright and him from the Rainbow Club. The trio met Thomas East and Hubert or Herbert Louis Ward at Payne's Grocery, whereupon Renita entered the car containing East and Ward.

At this point the officers directed Driver's attention to the various inconsistencies in his statements, and the fact that they had proof which contradicted some of what Driver had said. Driver stated that he would "tell ... the truth about it" if he could be permitted to speak to his mother and to his wife, who had arrived at the jail.

In Driver's final version of the events, he admitted that he himself had driven Renita Wright to Westmoreland. He said that they drove to Driver's grandfather's house, where Renita entered another car, supposedly because Driver's car was having transmission trouble.[1] Driver admitted that he had gone to Bear Carr Hollow to look for Renita's body at some point after he was interviewed by police in April, 1977.

A 16-year old State's witness named Ricky Lee O'Neal testified at trial that he was present during an argument between Graves and Graves' girlfriend, Terry Caldwell. O'Neal stated that Graves "said that him and a friend raped a girl and killed her and took her in the hollow." O'Neal testified further that he had heard Graves utter the above remarks on two or three occasions, about two years prior to trial.

Driver presented no defense at trial. Graves relied on alibi witnesses.

Both defendants allege that the State failed to establish sufficient evidence of the corpus delicti to corroborate their inculpatory statements. Two elements make up the corpus delicti in a homicide case: (1) the death of a human being; and (2) criminal agency in producing that death. *Wooten v. State*, 203 Tenn. 473, 314 S.W.2d 1, 5 (1958); *Ashby v. State*, 124 Tenn. 684, 139 S.W. 872, 875 (1911).

There is no dispute that a human being, Renita Wright, is dead, her remains having been found near a rough road in Bear Carr Hollow. The only question is whether the death was caused by criminal agency. As pointed out by the State, the evidence showed several factors which tend to indi-

1. "Another car" was what the jury heard. Before redaction, Driver's statement was that Renita got into *Graves'* car, with Graves.

cate criminal activity. The victim's remains were found in an isolated, desolate area, in heavy undergrowth and rough terrain, over thirty miles from the place where she had been seen last by her sister. Renita Wright had no automobile, and she would have had to have been conveyed to that location by another. The fact that the victim's body was found in a rural area, with no indication how it had been placed there, was found to be a contributing factor to the establishment of corpus delicti in *Joe Otey v. State of Tennessee*, Court of Criminal Appeals at Nashville, March 20, 1980, at 2. *See also Chafin v. State*, 333 So.2d 599, 603, 607 (Ala.Cr.App.1976) (skeletal remains of deceased, found in secluded rural area, coupled with other factors, indicated that death was caused by a criminal act).

Evidence of the victim's high spirits on the night of her disappearance is sufficiently documented in the record so as to preclude any reasonable possibility of suicide. The blouse worn by Renita Wright at the time of her disappearance was the only article of clothing found among her remains, indicating that it is likely that she was placed in the hollow that very night.

■ All elements of the corpus delicti may be established by circumstantial evidence. *Clancy v. State*, 521 S.W.2d 780, 783 (Tenn.1975); *Nichols v. State*, 200 Tenn. 65, 289 S.W.2d 849, 858 (1956). Whether or not the State has sufficiently established the corpus delicti is primarily a jury question. *McClary v. State*, 211 Tenn. 46, 362 S.W.2d 450, 454 (1962); *Williams v. State*, 552 S.W.2d 772, 776 (Tenn.Cr.App.1977). There was certainly enough evidence presented in the instant case for the jury to have reasonably concluded that the corpus delicti was established.

■ The defendants complain that their inculpatory statements were admitted into evidence prior to proof of corpus delicti. Such was not the case; but nevertheless, our Supreme Court has held that no error arises from the admission of a confession prior to proof of the corpus delicti. *Harris v. State*, 217 Tenn. 582, 399 S.W.2d 749, 752 (1966). Furthermore, only slight evidence of the corpus delicti is necessary to corroborate a confession and sustain a conviction. *Barksdale v. State*, 200 Tenn. 322, 292 S.W.2d 193, 195 (1956); *Northern v. State*, 541 S.W.2d 956, 959 (Tenn.Cr.App.1976). Indeed, this Court has held that a confession may be adequately supported by proof that the victim's body was secreted. *Berry v. State*, 523 S.W.2d 371, 374 (Tenn.Cr.App. 1974).

■ In *Berry*, the court noted that:

... it is not the law that the cause of death must be scientifically proven in every case. In many homicides this would be impossible, where, as here, there was substantial or total decomposition of the body.

*Berry v. State, supra*, 523 S.W.2d at 374. So in the case at bar, although the cause of death could not be shown, criminal agency could still be found.

Both defendants claim that the evidence adduced at trial was insufficient to sustain their convictions. It must be noted that a guilty verdict, returned by the jury and approved by the trial judge, accredits the testimony of the State's witnesses and resolves all conflicts in testimony in favor of the theory of the State. *State v. Hatchett*, 560 S.W.2d 627, 630 (Tenn.1978). The State receives the strongest legitimate view of the evidence on appeal, *State v. Cabbage*, 571 S.W.2d 832, 836 (Tenn.1978), and this Court may reverse only if we find that based on the proof in the record, no rational trier of fact could find guilt beyond a reasonable doubt. Rule 13(e), Tennessee Rules of Appellate Procedure; *State v. Patton*, 593 S.W.2d 913, 916–17 (Tenn.1979), quoting *Jackson v. Virginia*, 443 U.S. 307, 324, 99 S.Ct. 2781, 2791–2792, 61 L.Ed.2d 560 (1979).

■ The proof against Driver, beyond what was proved in establishing the corpus delicti, can be detailed as follows:

—Driver was the last person seen with Renita Wright while she was alive.
—Driver ignored Renita Wright's sister when she asked him, some several weeks after the disappearance, whether he knew what had become of Renita.

—Driver told police at least four different accounts of what transpired on the night in question, at first denying that he left the Rainbow Club with Renita.

—Driver smoked marijuana and drank beer prior to taking a polygraph examination, telling witness Herschel Williams that he "couldn't afford to tell the truth."

—Driver bragged that he had "beaten" the polygraph.

—Driver told Williams that Renita had been in the car with him in Westmoreland, that he had "smacked" her when she refused to have sex with his friends, that he removed himself from the car, and that "they went to a hollow."

—Driver was overheard by Williams asking Graves what happened to Renita.

—Driver acknowledged that he searched for Renita in Bear Carr Hollow after he was interviewed by police in 1977.

—Driver told police that he drove Renita from the Rainbow Club to Westmoreland, whereupon she entered another car.

—Driver lived less than four miles from the place where the remains were found.

The proof against Graves was as follows:

—When asked by police if he had ever seen or if he knew Renita Wright, Graves replied "Yeah, I know her; she's laying down there in the hollow, dead." He then denied having ever seen her.

—Within earshot of Williams, Graves responded to Driver's question asking what had happened to Renita after he (Driver) got out of the car by stating that "he didn't know anything about it and didn't want to hear anything about it."

—A teenager overheard Graves state to his girlfriend during arguments on two or three occasions that "him and a friend raped a girl and killed her and took her in the hollow."

—Graves lived less than four miles from the place where the remains were found.

The statements of both defendants mentioning a "hollow" were corroborated by the fact that the remains were found in Bear Carr Hollow.

From the above-delineated incriminating evidence, a jury could have found both defendants guilty beyond a reasonable doubt. Our courts have stated that "[i]n order to convict on circumstantial evidence alone, the facts and circumstances must be so closely interwoven and connected that the finger of guilt is pointed unerringly at the defendant and the defendant alone." *State v. Crawford*, 225 Tenn. 478, 470 S.W.2d 610, 613 (1971). In the instant case, circumstantial evidence coupled with the incriminating statements of the defendants themselves cause the "finger of guilt" to "point unerringly" at Driver and Graves as being those responsible for the death of Renita Yvonne Wright. The evidence is thus sufficient to sustain their convictions.

Defendant Graves complains of the decision by the trial judge to admit into evidence certain photographs offered by the State.[2] The photographs depicted various bones, a fragment of a blouse, and a ring, all of which belonged to the victim in this case, and all of which were recovered by police from Bear Carr Hollow. Graves claims that the photographs were not relevant or probative of any material issue in the case, but served only to inflame the jury.

The evidence depicted in the photographs was certainly relevant to the issues on trial. The pictures were taken at the location where the articles were discovered, and

2. It is true, as the defense points out, that the trial judge's reasons for admitting the photographs do not clearly appear in the record. Our Supreme Court has called this "an omission of some seriousness." *State v. Banks*, 564 S.W.2d 947, 952 (Tenn.1978). Given the absence of these reasons, this Court must in effect "second-guess" the trial judge on this question. *Id.* However, the record in this case is sufficiently clear to permit a ruling on the issue.

they demonstrated the extent to which the deterioration process had taken its toll. The jury was permitted to compare the photograph of the blouse fragment with the verbal description given of the blouse the victim was last seen wearing, as a means of deducing when she was originally placed in the hollow.

Graves alleges that the prejudicial effect of the photographs outweighs their probative value, under the standards enunciated in *State v. Banks, supra,* 564 S.W.2d at 951. This is simply not so. The photographs were accurate and clear depictions of the articles at the location in Bear Carr Hollow where they were discovered. The fact that the articles were found there, in the condition they were in, was essential to the establishment of the corpus delicti.

Furthermore, the photographs were in no way "gruesome and horrifying." No blood or injuries of any kind were depicted, and no decaying flesh or other matter was present. "Unfair prejudice," as defined in *Banks, supra,* was not injected into these proceedings by the introduction of these photographs.

We find no reversible error in the record, and we therefore affirm the judgment of the trial court.

DWYER and BYERS, JJ., concur.