# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### January 17, 2001 Session

## STATE OF TENNESSEE v. KENNETH LEE PIPKIN

**Direct Appeal from the Circuit Court for Stewart County**
**No. 4-190-CR-92    Robert E. Burch, Judge**

___

**No. M1999-00870-CCA-OT-PC - Filed November 9, 2001**

___

A Stewart County grand jury indicted the defendant on one count of first degree murder involving Marilyn June Adkins'[1] death.  Following a jury trial, he stood convicted of second degree murder. For this offense he received fifteen years as a Range I, standard offender.  Thereafter the defendant elected not to file a new trial motion and waived his right to bring a direct appeal. Nevertheless, he later filed a post-conviction petition alleging five grounds for relief.  Finding that trial counsel had provided ineffective assistance in advising the defendant regarding waiving direct appeal, this Court allowed him to file a delayed appeal. See Kenneth Lee Pipkin v. State, No. 01C01-9608-CC-00328, 1997 WL 749441 at *1, 8-9 (Tenn. Crim. App. at Nashville, Dec. 4, 1997.) As no new trial motion had been brought, the defendant was also allowed to file such motion. See id. at *9. Through this motion the defendant unsuccessfully alleged that there was insufficient evidence to support his conviction.  He now brings the same issue before this Court.  However, after reviewing the matter, we find it to lack merit and affirm the action of the lower court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court is Affirmed.**

JERRY L. SMITH, J., delivered the opinion of the court, in which DAVID H. WELLES and ROBERT W. WEDEMEYER, JJ., joined.

Kenneth R. Goble, Jr., Clarksville, Tennessee, for appellant, Kenneth Lee Pipkin.

Paul G. Summers, Attorney General & Reporter; Michael E. Moore, Solicitor General; David H. Findley, Assistant Attorney General; Dan Alsobrooks, District Attorney General; and George Sexton, District Attorney General, for appellee, State of Tennessee.

___

[1] The victim's last name is spelled "Adkins" in some portions of the record and "Atkins" in others. Because this Court utilized the former spelling in its post-conviction opinion related to this case, we will continue to use that spelling here.

# OPINION

## Factual Background

In deciding the defendant's case on post-conviction appeal, this Court summarized the facts as follows:[2]

> Marilyn June Adkins disappeared on December 30, 1990 and law enforcement officials found physical evidence to indicate that foul play was involved. Authorities discovered her abandoned car at the end of a deserted road and it appeared that someone had tried to run it over an embankment. Not too far away, the contents of Adkins' purse were found strewn on the side of the road in a logging area. A few miles away in a pine thicket, they found a pool of blood on the ground and a watch belonging to Adkins. Near the Paris Landing Bridge in Stewart County, authorities found a quilt, stained with blood, and a pair of brown jersey work gloves that had been thrown over an embankment. Despite extensive searches and efforts, they were unable to locate the victim's body. In September of 1992, appellant was indicted for the first degree murder of Adkins. Her body had not been recovered.

> [The defendant's] trial was set in August of 1993, but was continued due to defense counsel's difficulties in interviewing witnesses. After the continuance, rather unexpectedly, a commercial fisherman discovered the remains of a body in the Tennessee River on August 23, 1993. Only the lower portion of a body, from the waist down, was recovered. At [the defendant's] trial in March of 1994, the State offered proof that the remains were that of a white female, between the ages of 37 and 42, approximately 5'5" tall. This was consistent with the physical description of the victim. Testimony also indicated that based upon the degree of decomposition, the body had likely been submerged for one to five years. In addition, some of the victim's family members identified the pants and shoes that were found on the remains. The cause of death could not be ascertained due to the incomplete remains.

> In implicating the [defendant], testimony reflected that a witness had seen the victim and [the defendant] together in [the defendant's] truck at a boat dock several hours before she disappeared. The State alleged that the two were having an affair. Expert testimony demonstrated that the blood found on the ground and the quilt was consistent with that of the victim. The State alleged the quilt belonged to the [defendant], introducing testimony that he often covered the seat of his truck with a patchwork quilt, similar to the one discovered. The brown work gloves found with the quilt were shown to be of the kind [the defendant] used in operating a chain saw in his logging work. They smelled of gasoline and similar gloves were also found in a search of [the defendant's] home.

Id. at *1 (footnote omitted).

---

[2] Additional detail will be provided in the analysis of the defendant's issue.

**Sufficiency**

As aforementioned, the defendant asserts that the evidence presented at trial is insufficient to support his conviction for second degree murder. Specifically, the defendant alleges there are deficiencies in the proof related to the identification of the body, the cause of death, and the defendant's involvement in a knowing killing.

## A. Standard of Review

When a defendant challenges the sufficiency of the evidence, this Court is obliged to review that claim according to certain well-settled principles. A verdict of guilty, rendered by a jury and "approved by the trial judge, accredits the testimony of the" State's witnesses and resolves all conflicts in the testimony in favor of the State. State v. Cazes, 875 S.W.2d 253, 259 (Tenn. 1994); State v. Harris, 839 S.W.2d 54, 75 (Tenn. 1992). Thus, although the accused is originally cloaked with a presumption of innocence, the jury verdict of guilty removes this presumption "and replaces it with one of guilt." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). Hence, on appeal, the burden of proof rests with the defendant to demonstrate the insufficiency of the convicting evidence. Id. The relevant question the reviewing court must answer is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. See Tenn. R. App. P. 13(e); Harris, 839 S.W.2d at 75. In making this decision, we are to accord the State "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences that may be drawn therefrom." See Tuggle, 639 S.W.2d at 914. As such, this Court is precluded from re-weighing or reconsidering the evidence in evaluating the convicting proof. State v. Morgan, 929 S.W.2d 380, 383 (Tenn. Crim. App. 1996); State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Moreover, we may not substitute our own "inferences for those drawn by the trier of fact from circumstantial evidence." Matthews, 805 S.W.2d at 779. Of course, a criminal offense may be established exclusively by circumstantial evidence. State v. Tharpe, 726 S.W.2d 896, 899-900 (Tenn. 1987); State v. Jones, 901 S.W.2d 393, 396 (Tenn. Crim. App. 1995). However, the trier of fact must be able to "determine from the proof that all other reasonable theories except that of guilt are excluded." Jones, 901 S.W.2d at 396; see also, e.g., Tharpe, 726 S.W.2d at 900; .

With these guidelines in mind, we turn to the defendant's first two allegations. Essentially, through these he asserts that the State failed to prove the corpus delicti of second degree murder. To generally establish the corpus delicti of a crime, the State must prove "two elements: (1) [t]hat a certain result has been produced, and (2) [t]hat the result was created through criminal agency." State v. Ervin, 731 S.W.2d 70, 71-72 (Tenn. Crim. App. 1986). When dealing with a homicide, the State must establish beyond a reasonable doubt: "(1) the death of a human being and (2) criminal agency in producing that death." State v. Shepherd, 902 S.W.2d 895, 901 (Tenn. 1995).

## B. Identity of the Victim

The defendant begins by contending that the State did not meet its burden regarding the identification of the victim's body. While it true that to sustain the defendant's conviction, the State must have proven that the defendant murdered the individual named in the indictment, identification

may be proven by circumstantial evidence. In <u>Berry v. State</u>, 523 S.W.2d 371 (Tenn. Crim. App. 1974), this Court stated:

> Identification of a decomposed, burned, or mutilated body, or portion thereof, is frequently established by evidence showing a similarity between the physical characteristics of the remains and of the victim, coupled with evidence that the clothing, or fragments thereof, found on or near the remains was the same as, or similar to, clothing worn by the victim.

<u>Id</u>. at 374. The Court added that "[c]ircumstantial evidence of the identity of a body may be found in the correspondence of peculiar physical characteristics, or in clothing, or articles found in connection with the remains." <u>Id</u>; <u>see also</u>, <u>e.g.</u>, <u>State v. Henry Lee Berry</u>, No. E1999-00704-CCA-R3-CD, 2000 WL 1100330 at *5 (Tenn. Crim. App. at Knoxville, August 3, 2000).

In the instant case Dr. Charles Harlan, the medical examiner who analyzed the recovered lower portion of the body, testified that the specimen he had received had on black pants and white tennis shoes. Dalton Adkins, the victim's husband, recalled that she had been wearing a red blouse, black slacks, and white-pinkish[3] tennis shoes on the night of her disappearance. Furthermore, Sherry Angus, the victim's daughter, identified the black pants and white tennis shoes recovered as those which had belonged to her mother.[4] From viewing the remains of the body itself, Harlan concluded that the individual had been a white[5] female. Also in the course of his examination, Harlan determined that the body had been in the water from one to five years. Other testimony indicated that the victim in this case had been missing for approximately two years and eight months when these remains were recovered.

Dr. William Bass, the director of the University of Tennessee at Knoxville's forensic anthropology center, provided further information concerning the available portion of the body. From his analysis of the bones provided, Bass concluded that the remains had belonged to a thirty-seven to forty-two year old woman who had stood five foot two inches to five foot eight inches tall.

---

[3] Additional testimony established that the white tennis shoes had pink trim on them.

[4] Angus had been with her grandmother when her grandmother had purchased the pants and had been with the victim when the victim had purchased the shoes. This witness and Dalton Adkins also stated that the victim had worn size 7 ½ shoes, and the shoes recovered with the remains were size 7 ½. In addition, Angus and Adkins identified as belonging to the victim various items found in the general vicinity of the lake from which the body had been recovered.

[5] Emily Craig, a Ph.D. candidate in Forensic Pathology and a graduate assistant to Dr. William Bass, also testified concerning the race of the individual recovered from the water. Craig's specialty involved making determinations about a person's race based upon knee/femoral remains. While admittedly the study she used in reaching her determination in this case only distinguished between white and black individuals, Craig was of the opinion that the knee joints and femurs she had examined belonged to a white/Caucasian person.

As revealed through the testimony of her husband, the victim had been almost forty-one years of age[6] and five foot five to five foot six inches tall. Moreover, her driver's license stated that her date of birth was 1/15/49 and her height was five foot five inches.

Viewing these facts in the light most favorable to the State, we find that there is ample evidence from which a jury could conclude the remains recovered were those of the victim.

## C. Cause of Death

The defendant next challenges the sufficiency of the convicting evidence because the medical examiner could not determine "the actual cause of death." In making his claim, the defendant acknowledges Dr. Harlan's testimony that the death resulted from a homicide, but the defendant avers that this is legally insufficient.

We, therefore, consider whether the State has proven that criminal agency produced the victim's death. Our state supreme court has held that the evidence must show that the death did not result from an accidental, a suicidal, or a natural cause. See Seagroves v. State, 281 S.W.2d 644, 645, 198 Tenn. 633 (Tenn. 1955); Davis v. State, 445 S.W.2d 933, 935 (Tenn. Crim. App. 1969). Furthermore, this Court has held that "although the cause of death could not be shown, criminal agency could still be found." State v. Driver, 634 S.W.2d 601, 606 (Tenn. Crim. App. 1981). Thus, we must determine if the record reflects beyond a reasonable doubt that the victim died as a result of a criminal homicide.

During his testimony Dr. Harlan stated that the remains that he had received had a ligature made of cloth and baling wire attached to the belt. He added that from his experience ligatures like this had weights attached to them without which a body would float to the surface. In his opinion the person, whose lower portion of the body he had examined, had died by homicidal means.

Turning more specifically to the victim's disappearance, we find more support for this conclusion. According to her husband the victim had taken food from the freezer to thaw before leaving the house for the last time. After the victim had been reported as missing, a deer hunter named Jerry Lee discovered a blue Thunderbird or Cougar in a remote area of Stewart County. The driver's door was open, and no tracks from the automobile could be seen in the recent snowfall. Following Lee's report of this vehicle, Stewart County Sheriff David Hicks went to the area where it had been found and subsequently determined that the car had belonged to the victim. During a search begun the next morning, various items[7] from the victim's purse were located around one half to three quarters of a mile from the car. The items were strewn along an approximately "two hundred yard stretch of Old Highway 79." Additional searches of the general vicinity revealed a sample of blood on the ground, a woman's watch, and a blood-stained quilt. The watch and the blood on the ground were discovered about thirty-five feet apart, and the grass beyond the watch was matted down as if something had been dragged across it. Subsequent testing of the

---

[6] This witness actually errantly testified that the victim would have been forty-three or forty-four years old. However, he had provided her birthday as January 15, 1949, and agreed that her age at the time of her disappearance would have been the time which had passed from this date until December 30, 1990. As such, the victim would have been less than one month short of her forty-first birthday when she vanished.

[7] The items included photographs of family, a calculator, an address book, a wallet, a driver's license, etc.

grass/straw/broom sage from the patch of blood disclosed that the blood had come from a human. As for the quilt, a sample of the blood from it was later tested against a sample of menstrual blood from a nightgown of the victim.[8] This DNA testing revealed that the possibility that these samples were not from the same person was one in six million.

Based upon these facts and using the above-outlined standards, we again conclude that the evidence is legally sufficient to support a conclusion that the victim was killed in a criminal homicide. Thus, this portion of the defendant's argument also lacks merit.

## D. The Defendant's Involvement

Next the defendant avers that the State did not sufficiently prove that he had killed the victim. More specifically, the defense alleges that the best "any witness could do was to place the defendant and the victim together briefly prior to the period of time they believe the action occurred." Before examining this contention, we note that circumstantial evidence may certainly be sufficient to prove the defendant's identity. See State v. Darnell, 905 S.W.2d 953, 961 (Tenn. Crim. App. 1995).

After reviewing the record, we find numerous pieces of evidence tying the defendant to the murder. We first note that the defendant denied having been with the victim on the day of the victim's disappearance but later acknowledged that he had previously met her at the Dyers Creek boat ramp. On the date of the victim's disappearance, a fisherman had seen a newer model red pickup truck and a blue Thunderbird parked beside one another at the boat ramp. At the time, the defendant had such a pick-up, and the victim drove a Thunderbird matching this description. This witness added that no one had been in the Thunderbird when he had seen the vehicles, but a man and woman had been sitting in the truck. The woman was on the passenger's side. There was also testimony that the defendant and the victim had been having an affair. On the day the victim vanished the defendant had been uncharacteristically late in picking up from work the woman he had been dating and later married. In addition, around the time of the victim's disappearance, the defendant made his living running a chain-saw as a logger. A fellow logger observed that the defendant had seemed nervous around this time.[9] Gloves used by loggers and similar to those found in the defendant's home were recovered in the area of the aforementioned blood-stained quilt. These gloves had what appeared to be wood chips in them. According to the above-referenced co-worker the gloves smelled like they had been used with a chain-saw,[10] and testing revealed that these gloves

---

[8] No blood was available for testing from the recovered portion of the body, and tissue from the remains were no longer suitable for use in such testing.

[9] Ted Tarpley, an investigator for the local district attorney general's office, indicated that the defendant had shaken visibly during his interview.

[10] This witness also stated that the use of the gloves with a Weed-Eater could produce the same smell. Additionally, Jerry Swift, the defendant's employer testified that there had been hundreds of loggers in the area at the time of the offense and that loggers typically ran through numerous pairs of these gloves while working. He added that the loggers often threw the gloves on the ground when the gloves became worn.

had human blood on them.[11] Furthermore, multiple witnesses stated that the defendant had kept a quilt in his truck, yet when the police saw the truck within a few days after the victim's disappearance, no quilt had been in it. The subsequent search of the defendant's home within days of the disappearance also revealed no quilt.[12] However, relatively distinct fibers later taken from his truck and from the recovered blood-stained quilt were consistent with one another.[13]

From the evidence presented we find that the State has met its burden of proof with regard to the defendant's involvement in the victim's death. This contention, therefore, also lacks merit.

### E. Knowing Killing

Finally, the defendant asserts that even if sufficient proof exists connecting him with the victim's death, "there was little or no evidence that this was a knowing killing of another." Tennessee Code Annotated § 39-13-210(a) does require proof of a knowing killing in order to convict a defendant of second-degree murder.[14] Our code further provides that:

"Knowing" refers to a person who acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result.

Tenn. Code Ann. § 39-11-106(a)(20).

In evaluating an attempted second degree murder conviction, this Court stated that "[i]ntent, which can seldom be proven by direct evidence, may be deduced or inferred by the trier of fact from the character of the assault, the nature of the act and from all the circumstances of the case in evidence." State v. Elder, 982 S.W.2d 871, 876 (Tenn. Crim. App. 1998). This analysis is also appropriate for the question currently before the Court. Moreover, whether the defendant "knowingly" killed the victim is a question of fact for the jury. See State v. Fredrick Dewayne Rollins, No. 03C01-9706-CR-00200, 1998 WL 18205 at *2 (Tenn. Crim. App. at Knoxville, Jan. 20, 1998). This Court has also provided that "the determination of whether all reasonable theories are excluded by the circumstantial evidence is primarily a question of fact for the jury." State v. Henry Lee Berry, 2000 WL 1100330 at *5. Furthermore, we are again reminded that this Court may

---

[11] The sample was not large enough to allow for successful DNA testing; thus, this witness did not seek such.

[12] A .25 automatic with five bullets in the clip was, however, taken.

[13] The defendant did present a witness who alleged that the quilt involved was not like the one the defendant had kept in his truck.

[14] As aforementioned, a Stewart County grand jury had charged the defendant with first degree murder, but he was convicted of second degree murder. The State notes that a homicide, once established, is presumed to be second degree murder according to long-established caselaw. See State v. Brown, 836 S.W.2d 530, 543 (Tenn. 1992).

not substitute its own inferences "for those drawn by the trier of fact from circumstantial evidence." Matthews, 805 S.W.2d at 779.

As discussed in previous issues, the proof in the instant case established that the victim did not die from accidental, suicidal, or natural means and that the defendant was involved in her death. In addition, there was an obvious attempt to hide her remains. Furthermore, the absence of blood in the victim's and the defendant's vehicles and the blood patch located off of an old logging road allow an inference that the defendant may have taken the victim to a secluded wooded area in order to accomplish the murder. The watch recovered near the blood patch had a broken band, and the transcript reveals that the defendant had scratches on his face shortly after the disappearance.[15] This evidence is more than sufficient for a rational trier of fact to conclude that the defendant "knowingly" killed the victim.

### Conclusion

For the foregoing reasons we find that the defendant's contentions do not merit relief. Accordingly, the judgment of the trial court is AFFIRMED.

_____
JERRY L. SMITH, JUDGE

---

[15] The defendant attempted to explain that these had been made by briars.