IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs August 5, 2008

## STATE OF TENNESSEE v. REGGIE CARNELL JAMES

**Appeal from the Circuit Court for Madison County**
**No. 06-568     Donald H. Allen, Judge**

**No. W2007-00775-CCA-R3-CD   -   Filed March 10, 2009**

A Madison County jury convicted the defendant, Reggie Carnell James, of one count of first degree murder and one count of tampering with evidence. The trial court sentenced the defendant to life in prison for the murder conviction and ten years as a Range II, multiple offender, for the evidence tampering conviction. On appeal, the defendant argues that the evidence produced at trial was insufficient to sustain his convictions. After reviewing the record, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which NORMA MCGEE OGLE, J., joined. THOMAS T. WOODALL, J., not participating.

Robert Brooks, Memphis, Tennessee (on appeal); and J. Michael Mosier, Jackson Tennessee (at trial), for the appellant, Reggie Carnell James.

Robert E. Cooper, Jr., Attorney General and Reporter; Jennifer L. Bledsoe and Rachel E. Willis, Assistant Attorneys General; James G. Woodall, District Attorney General; and Alfred Earls and Jody Pickens, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

At trial, Roy Lee Clark testified that one evening in May 2005, he arrived at the defendant's house. After a while, Clark left the house and went to a gas station; upon his return, Clark saw that two other men, Roy Gardner and Raymond Thomas (the victim in this case), had arrived. Clark said that he, the defendant, Gardner, and the victim spent fifteen to twenty minutes using cocaine before going outside. Clark said that once outside, the victim spent "about thirty minutes" tilling in the defendant's flower bed before the four men went back inside to use more cocaine. During this time,

Clark and the victim sat on a loveseat in the defendant's living room, with the defendant walking back and forth in front of them with a pistol in his hand. Clark said that none of the other three men had a weapon at the time of this incident. After a while, Clark heard a gunshot and then heard the victim "hollering" and asking the defendant why he had shot him. According to Clark, the defendant did not reply to the victim's question. Clark said that he did not see any blood during this incident. At some point after the shooting, the victim slumped over, with his knees on the floor and his upper body on the couch.

Clark testified that after the shooting, he ran to the door in an attempt to leave and get help for the victim, who Clark said was still alive at this point, but that the defendant stood in the doorway and refused to let him take the victim to the hospital. The three men then went outside. According to Clark, the defendant said that "he had to finish what he had started," and that he "wasn't gonna . . . let [the victim] live." At that point, the defendant returned inside while Clark and Gardner remained outside. Clark then heard a gunshot, after which the defendant told the other two men to come inside. They did, and upon entering the living room Clark saw the victim with a gunshot wound "[b]etween his shoulder and his head, by his head." Clark said that at this point, the defendant still had a pistol in his hand. Clark said that the evening after the shooting, he and Gardner were at Gardner's house when the defendant arrived. Clark asked the defendant about the victim, and the defendant replied that the victim "was still on the couch."

Clark acknowledged that he was serving a sentence for aggravated assault and that he had three prior convictions for theft of property and convictions for evading arrest and attempted aggravated robbery. On cross-examination, Clark said that because of his daily cocaine use, he was unable to remember the exact date or day of the week on which this incident occurred, although he did remember that the incident occurred in the afternoon. He also said that he was unsure of the date, or even the month, on which this trial was occurring. Clark admitted that he did not see the defendant shoot the victim and that the defendant did not point a gun at him or Gardner. Clark also admitted that he did not hear the defendant threaten him during the incident. Clark said that Gardner later told him that the defendant had threatened Clark's life, but he also admitted that Gardner was a convicted felon. He denied that he, Gardner, and the victim entered into a plot to rob the defendant. He said that when he, Gardner, and the defendant went outside after the shooting, he and Gardner played basketball to avoid arousing the suspicion of the neighbors, who were in the yard next door.

The substance of Roy Gardner's testimony matched much of that provided by Clark. Gardner said that when the defendant shot the victim, he was sitting on a chair next to the loveseat on which the victim and Clark were sitting. Gardner saw the defendant pacing in front of the loveseat, pistol in hand, before he saw the defendant shoot the victim "in his upper body." Gardner asked the defendant to take the victim to the hospital, but the defendant refused. The men then went outside, with the defendant telling Gardner that "if anything was said . . . we would be next." After the men went outside, the defendant told the other men that "he might as well go in there and finish it," at which point the defendant returned inside. Gardner then heard a gunshot.

After the shooting, Gardner and the defendant left in the victim's pickup truck. After visiting a store, they returned to the defendant's house, with Gardner dropping off the defendant and then

driving away. Gardner drove the victim's truck to a remote area about a mile from his house, abandoned the truck, and ran home. Gardner said that he did not see the defendant after this incident.

Gardner acknowledged that he was in federal custody for a weapons offense and that he had prior state convictions for criminal impersonation and theft. On cross-examination, Gardner said that he could not remember the exact date on which these events occurred, other than the shooting happened on a May afternoon. He recalled that he and the other men "smoked a lot" that day. He recalled seeing blood on the loveseat, but he was unsure whether the victim was alive or dead when they left the defendant's house the first time. Unlike Clark, Gardner said that he did not see anyone standing in the yard next door. He also had no independent knowledge of what happened to the victim's truck after he abandoned it, although he later learned that it was found burned.

Regarding the police investigation, Deputy David Travis of the Madison County Sheriff's Department testified that on May 26, 2005, he discovered a burned-out vehicle in a field in a rural part of Madison County. Deputy Travis said he was unable to find the vehicle's license plate or its Vehicle Identification Number (VIN), but he did find a vanity license plate which read "Popeye" on the ground in front of the vehicle. Agent Jim Medlin with the Tennessee Highway Patrol (THP) said he inspected the vehicle, which he described as a "Chevrolet or GMC truck," at an impound lot after it had been towed from the field. Agent Medlin was able to find the vehicle's VIN, and after searching vehicle records, he learned that the truck was a white 2001 Chevrolet Silverado registered to the victim and his mother, Pat Thomas.

Lieutenant Anthony Heavner with the Madison County Police Department testified that he originally became involved in this case when the victim's burned pickup truck was recovered in rural Madison County, near the Haywood County line. Ultimately, the nature of the case turned from a "burned vehicle" case to a missing person case. Through his investigation, Lieutenant Heavner learned from the victim's wife that the victim had been at his house on May 18, 2005, and he also learned that when the victim's vehicle was recovered May 26, nobody had reported the vehicle stolen. Lieutenant Heavner provided the victim's name and identifying information for the National Crime Information Center (NCIC) database, and he also notified the National Center for Missing and Exploited Persons about the victim's disappearance. Lieutenant Heavner said that as of the trial date, neither the NCIC nor the Center for Missing and Exploited Persons received any information regarding the victim.

Lieutenant Heavner said that he first investigated the defendant after the victim's wife, who knew that the victim and the defendant "hung out" and used drugs together, informed the police that the defendant had visited her house. Thus, on June 3, 2005, Lieutenant Heavner visited the defendant at his home in Jackson. The defendant told Lieutenant Heavner that he had not seen the victim. On July 1, Lieutenant Heavner returned to the defendant's home after the sheriff's department received an anonymous call in which the caller said that the victim's blood could be found in the defendant's home. After Lieutenant Heavner informed the defendant of this development, the defendant gave police permission to search his house. The defendant told the officers that he was in the process of moving and that there would be little furniture in the house. Once Lieutenant Heavner entered the living room, he saw a spot in the carpet, a spot "larger than a

3

basketball," that appeared to be stained. Lieutenant Heavner initially believed the spot was blood, but when he looked at the spot more closely he saw that the spot "looked like it was full of some type of soapy material." In fact, Lieutenant Heavner later found a bottle of Resolve brand carpet cleaner in the house. He asked the defendant about the spot; the defendant replied that his dogs "might have brought something into the house, some type of animal or something." Before leaving the defendant's house, the lieutenant cut out the section of stained carpet, and the underlying carpet pad, and he took a written statement from the defendant in which he denied any knowledge of the victim's disappearance and said that he had taken the couch to his aunt's house.

Lieutenant Heavner sent the carpet taken from the victim's house to the Tennessee Bureau of Investigation (TBI) for testing. He also sent DNA samples from the victim's wife and children, as well as a sample taken from the victim's razor, to the TBI lab. On August 1, 2005, he again spoke with the defendant, this time in police custody. After being informed of and waiving his Miranda rights, the defendant gave a written statement to police. In the statement, the defendant said that the victim, whom he called "Popeye," came to his house along with Gardner and Clark. The defendant said that he had been "smoking crack non-stop . . . and was high when they came by" and did drugs with the other men before going to another part of the house. The defendant claimed that while he was away from the other men, he heard a gunshot. When he returned to the living room, he saw the victim lying on the floor, with Gardner and Clark standing over him. The defendant said that he did not see any blood at the time but recalled that the victim came to rest on the section of carpet that Lieutenant Heavner removed. The defendant said that Gardner and Clark then "put Popeye in his truck and took him away. I don't know where they took him or if he was dead at that point." The defendant insisted that the two men did not tell him what they did with the victim or his truck.

On September 1, after he had taken a statement from Gardner implicating the defendant in the victim's death, Lieutenant Heavner again interviewed the defendant. After waiving his Miranda rights, the defendant gave a statement in which he admitted shooting the victim. In the statement, the defendant claimed that he, the victim, Gardner, and Clark were doing drugs at his house when he became suspicious about their behavior and about the fact that they were carrying screwdrivers and knives. He also claimed that he heard voices in his head because of his drug use. At some point, the defendant "got paranoid" and became fearful that the other men would "do bodily harm to me, kill and rob me because I had drugs." Thus, he shot the victim in the head. The defendant said that he walked around for a while before shooting the victim again, this time in the chest. He said that the victim slumped onto the couch, with the victim's blood soaking through the couch so that a section of carpet underneath the couch became blood-soaked. The defendant claimed that Gardner drove away in the victim's truck and that he never saw the victim's truck again. The defendant said that later, he wrapped the victim's body in a tarp, wrapped a chain around the body, ran the chain through some concrete blocks, drove to a bridge over the Forked Deer River in Westover, and dumped the body into the river. The defendant also said that he threw the gun he used to shoot the defendant, a .40 caliber Ruger 94, into the river.

The defendant led police to a dump where he had left the couch on which the victim was shot. Lieutenant Heavner said that areas on the couch's seat cushions and arm appeared to be soaked with blood. He sent fabric samples from the couch to the TBI lab for testing. The lieutenant observed that the couch appeared to be weather-beaten. In his statement, the defendant said that he

4

"had to get rid of" the couch because it had blood on it. The defendant also admitted cleaning the carpet with Resolve brand carpet cleaner in an attempt to remove the blood stains.

The day of his statement, the defendant led police to the bridge from which he claimed to have dumped the body. Lieutenant Heavner said that on September 1, 2005, the Forked Deer River "was about to overflow its banks" and that the river's current was much swifter than usual because of Hurricane Katrina, which made landfall along the Mississippi Gulf Coast on August 29. Thus, neither the police nor the Madison County Fire Department's rescue squad attempted to search the river that day. On September 2, the fire department attempted to search the river using drag lines, but the river's current made such a search impossible. The fire department searched the river on September 6, and the police searched the river on September 9, but those searches produced nothing either time. The police also conducted an aerial search, but that search also produced nothing of evidentiary value.

On cross-examination, Lieutenant Heavner said that while he was certain that the victim's wife had reported that the victim had been in her home on May 18 and that the victim's truck was found on May 26, he was unsure of the exact date on which the victim was killed. He also said that he did not recover any shell casings from the couch or the defendant's home, nor did he see any bullet holes in the couch or in the wall or floor of the defendant's home. He did note, however, that the couch had several tears on it, which he attributed to the couch's being "outside in the elements." Lieutenant Heavner said that he only had the couch tested for blood, not gunpowder residue, noting that in his law enforcement experience he had never dealt with evidence of stipling on anything other than the human body. Furthermore, he said that the fact that the couch had been in the elements made it unclear whether there would be any gunpowder residue on the couch.

Sergeant Felicia Stacy with the Madison County Sheriff's Department testified that she was present on September 9, 2005, when THP divers searched the river near the spot where the defendant claimed to have dumped the victim's body. She said that the divers found two concrete blocks attached by a chain, with the manner in which the chain was run through the blocks consistent with the defendant's description. However, on cross-examination she admitted that the divers recovered no clothing items and that there was nothing to conclude with any certainty that the blocks and chain had been used to weigh down a body. Sergeant Stacy testified that she investigated the victim's financial records and discovered that the victim had not accessed any of his accounts since May 2005.

TBI Agent Donna Nelson testified that she tested the sections of carpet and couch fabric collected in connection with this case. She said that while both the carpet and the couch fabric tested positive for human blood, she was unable to obtain a DNA profile from either sample. She said that the carpet's being cleaned with detergent and the couch's being left in the elements could have caused the DNA present in the blood to degrade.

Three members of the victim's family—his widow, Candice Thomas; his seven-year-old son, Dalton Thomas; and his mother, Pat Thomas—testified that they had not seen the victim since May 2005 and that they loved him and missed him. Specifically, Candice Thomas testified that she last saw the defendant on May 14, 2005, although she said that her husband had been in the family home

5

on May 18. She said she knew her husband had been in the home that day because some of her belongings had been disturbed. She said that she had monitored her financial records since May 2005 and that there was no indication that her husband had accessed the accounts during that time. She said she knew her husband had a drug problem and that he was occasionally away from the home, but he was never gone more than a week at a time. She said that she was not concerned about her husband's disappearance until his truck, which the victim considered his "pride any joy," was discovered burned. She said that her husband was known as "Popeye" and that he kept a vanity license plate which read "Popeye" on the front of his truck. The victim's widow said that the defendant had visited her house after the victim "went missing" but before his truck was discovered. She recalled that the defendant asked her "if [she] had heard anything," to which she replied she had not.

At the close of the State's proof, the parties stipulated that the victim had not been treated at any of eight major West Tennessee hospitals since his disappearance.

The defendant's only witness, William Merriman, testified that on May 24, 2005, he saw the victim, whom he had known since at least 1975, at a gas station. Merriman said that the victim told him that the two men should take a vacation. Merriman did not recall where the victim wanted to go on vacation.

After receiving the evidence, the jury convicted the defendant of one count of first degree murder and one count of evidence tampering as charged in the indictment. The defendant subsequently filed a timely notice of appeal.

ANALYSIS

The defendant argues that the evidence produced at trial was insufficient to support his convictions for first degree murder and tampering with evidence. In raising this argument, the defendant asserts that: (1) the jury's verdict was based in part on "highly prejudicial and completely irrelevant" testimony from the victim's family; (2) the evidence of the defendant's guilt was established largely through the unreliable testimony of two men who were both convicted felons and admitted drug addicts; and (3) the defendant's testimony, in which he said he shot the victim in self-defense while under the influence of cocaine and while being told to do so by voices in his head, established reasonable doubt. We disagree.

An appellate court's standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979) (emphasis in original). The appellate court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). A guilty verdict removes the presumption of innocence and replaces it with

a presumption of guilt, and on appeal the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict.  Id.; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).  This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence.  State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

First Degree Murder Conviction

A conviction for first degree premeditated murder requires proof that the defendant committed a "premeditated and intentional killing."  Tenn. Code Ann. § 39-13-202(a)(1).  The first degree murder statute explains the term "premeditation" as follows:

> "[P]remeditation" is an act done after the exercise of reflection and judgment.  "Premeditation" means that the intent to kill must have been formed prior to the act itself.  It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time.  The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Id. § 39-13-202(d).  The presence of premeditation is a question for the jury and may be established by proof of the circumstances surrounding the killing.  Bland, 958 S.W.2d at 660.  Our supreme court has held that factors demonstrating the existence of premeditation include, but are not limited to, the following:  the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, declarations by the defendant of an intent to kill, evidence of procurement of a weapon, preparations before the killing for concealment of the crime, destruction or secretion of evidence of the killing, and calmness immediately after the killing.  See State v. Davidson, 121 S.W.3d 600, 614 (Tenn. 2003); Bland, 958 S.W.2d at 660.  Additional factors cited by this court from which a jury may infer premeditation include lack of provocation by the victim and the defendant's failure to render aid to the victim.  See State v. Lewis, 36 S.W.3d 88, 96 (Tenn. Crim. App. 2000).

The victim's body was never recovered; however, "[t]he failure to recover a victim's body should not be fatal to the prosecution of a homicide.  Requiring a body would afford absolute immunity to defendants who are cunning enough to destroy the body or otherwise conceal its identity."  State v. Kenneth Patterson (Pat) Bondurant, No. 01C01-9501-CC-00023, 1996 WL 275021, at *4 (Tenn. Crim. App. May 24, 1996).  "Two elements make up the corpus deliciti in a homicide case: (1) the death of a human being; and (2) criminal agency in producing that death."  State v. Driver, 634 S.W.2d 601, 605 (Tenn. Crim. App. 1981).  The State is required to prove these elements beyond a reasonable doubt, see State v. Shepherd, 902 S.W.2d 895, 901 (Tenn. 1995), but proof of these elements may be established through circumstantial evidence, see Driver, 634 S.W.2d at 606.  Regardless of the manner of evidence used to establish the elements of the offense beyond a reasonable doubt, "[i]n homicide prosecutions it must be proved that the death was not occasioned by natural causes, by accident, or by the deceased person."  Shepherd, 902 S.W.2d at 901(citing Davis v. State, 445 S.W.2d 933, 935 (Tenn. Crim. App. 1969)).

7

In this case, the defendant admitted to killing the victim and dumping his body in a river after committing the offense. Gardner and Clark, the other two men present at the defendant's house at the time of the offense, both testified that they saw the defendant shoot the unarmed victim before they went outside, and once outside they heard the defendant announce that he had to "finish what he had started." They saw the defendant return to the house, and a short time later they heard another gunshot. Once Gardner and Clark reentered the house, they saw the defendant slumped motionless on the couch. The defendant admitted to police that he cleaned the carpet and dumped the couch on which the victim was shot, and the police recovered both a section of the defendant's bloody carpet that had been cleaned with detergent and the couch, which was left outside in a remote dump. The police also recovered concrete blocks and a chain in the river near the spot where the defendant admitted dumping the victim's body. Finally, the victim's family testified that they had not seen the victim since he disappeared, and the evidence also showed that the defendant had not accessed his financial accounts or been treated at any West Tennessee hospital after the incident. Thus, despite the fact that the victim's body was not recovered, the evidence produced at trial was sufficient to establish the elements of first degree premeditated murder beyond a reasonable doubt.

In concluding that the evidence was sufficient to convict the defendant of first degree murder, we are unpersuaded by the defendant's assertions outlined above. Regarding the testimony of the victim's family members, all of whom testified that they had not seen the defendant since his disappearance and that they greatly loved and missed the victim, the defendant did not object to this testimony at trial. A party's failure to make a contemporaneous objection to trial testimony typically results in a waiver of the issue on appeal. Tenn. R. App. P. 36(a); State v. Thompson, 36 S.W.3d 102, 108 (Tenn. Crim. App. 2000). Furthermore, even if not waived, the defendant's contention would be without merit. The victim's body was not recovered, so the testimony from the victim's family members was relevant in establishing that the victim was no longer alive. Regarding the testimony of Clark and Gardner, the jury was made aware of the witnesses' criminal histories and their drug use and still chose to accredit the witnesses' accounts of the victim's death. Such was within the jury's province as trier of fact. Furthermore, while the defendant's statement to police, in which he claimed that he killed the victim in self-defense and that he was high on cocaine at the time of the killing, was introduced into evidence, and while the jury was given instructions on voluntary intoxication and self-defense, the jury chose to discredit the defendant's theories. Such was also the jury's prerogative as factfinder. Accordingly, we deny the defendant relief on this issue.

Tampering With Evidence Conviction

The defendant was also convicted of tampering with evidence. Tennessee law states that it is "unlawful for any person, knowing that an investigation or official proceeding is pending or in progress, to . . . [a]lter, destroy, or conceal any record, document or thing with intent to impair its verity, legibility, or availability as evidence in the investigation or official proceeding . . . ." Tenn. Code Ann. § 39-16-503(a)(1). In this case, the defendant admitted that after killing the victim, he wrapped the victim's body in a tarp, weighed down the body with concrete blocks tied together with a chain, and dumped the victim's body and the gun he used to kill the victim into a Madison County river. The police did not recover the defendant's gun or the victim's body, but they did recover two concrete blocks and a chain in the river near where the defendant said he dumped the body.

8

Furthermore, the defendant admitted to cleaning his blood-soaked carpet and dumping the couch on which the victim was shot. Lieutenant Heavner testified that on July 1, 2005,[1] over a month after he initially spoke with the defendant, he saw a section of carpet in the defendant's house that appeared to contain both blood and detergent; the officer also saw a container of the same brand of carpet cleaner the defendant later admitted using to clean the carpet. When the defendant led police to the couch on September 1, it was weather-beaten. A TBI agent testified that the bloody carpet and couch's exposure to detergent and the elements, respectively, could have led to the degrading of the DNA profiles in the blood samples taken from the fabric. This evidence was sufficient to convict the defendant of tampering with evidence; as such, we deny him relief on this issue.

## CONCLUSION

In consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
D. KELLY THOMAS, JR., JUDGE

---

[1]The July 1 date on which Lieutenant Heavner observed the defendant's carpet falls outside the period alleged in the indictment, which was "on or about May 18 through May 26 of 2005." However, this court has observed that "[a] variance between an indictment . . . and the evidence presented at trial is not fatal unless it is both material and prejudicial." State v. Shropshire, 45 S.W.3d 64, 71 (Tenn. Crim. App. 2000) (citing State v. Moss, 662 S.W.2d 590, 592 (Tenn. 1984)). The defendant was sufficiently aware of the evidence tampering charge and was able to adequately prepare for it, so no prejudice resulted to the defendant. See Moss, 662 S.W.2d at 592.