# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs June 7, 2011

## STATE OF TENNESSEE v. RICKIE SIPES

### Direct Appeal from the Circuit Court for Hardeman County
### No. 2010-CR-92     J. Weber McCraw, Judge

### No. W2010-02524-CCA-R3-CD  - Filed August 12, 2011

The defendant, Rickie Sipes, was convicted of first degree premeditated murder and sentenced to life imprisonment in the Department of Correction.  On appeal, he argues that the trial court erred in denying his motion for judgment of acquittal and for a new trial because the evidence was insufficient to sustain his conviction.  Following our review, we affirm the judgment of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed

ALAN E. GLENN, J., delivered the opinion of the Court, in which JAMES CURWOOD WITT, JR. and NORMA MCGEE OGLE, JJ., joined.

James O. Martin, Nashville, Tennessee (on appeal); Gary F. Antrican, District Public Defender; and Shana Johnson, Assistant Public Defender (at trial), for the appellant, Rickie Sipes.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel E. Willis, Senior Counsel; D. Michael Dunavant, District Attorney General; and Joe Van Dyke, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## FACTS

According to the State's proof at trial, on the night of September 13, 2009, the defendant dressed himself in dark clothing and, armed with a loaded revolver, traveled to Anita Bray's home.  After confronting Ms. Bray about some money he thought she had stolen, the defendant shot her four times.  The victim died from the gunshot wounds.  As a result, the defendant was indicted for first degree premeditated murder.

At trial, the victim's mother, Charlene Hodge, testified that the victim typically called her every morning at 8:00. On the morning of September 14, 2009, however, Ms. Hodge did not receive a call from the victim. When Ms. Hodge went to check on her, she noticed that the storm door on the victim's mobile home was unlocked. Ms. Hodge was concerned because the victim "always" kept the storm door locked. The inside door, which also normally remained locked, was unlocked as well. Ms. Hodge testified that she had to struggle to open the inside door and that when she finally got inside, she realized that the victim's body had been blocking the door. She knew the victim was dead because "her head was laying [sic] . . . in a puddle of blood and there was blood on her shirt and . . . her eye was out of socket and the other eye was turned in."

Billy Davis, Chief Deputy with the Hardeman County Sheriff's Office, testified that the initial investigation into the victim's death led nowhere, but investigators eventually "received information that [the defendant] had confessed to individuals that he was responsible for . . . the death of [the victim]." Deputy Davis then went to speak to the defendant who waived his Miranda rights and consented to a search of his home. During the search, investigators discovered a box of ammunition, a black toboggan, a revolver with four spent and four unspent rounds, a black jacket, and a pair of work boots, all of which were found buried under the earthen floor of a storage room. After officers confronted the defendant with what they had found and again informed him of his rights, he gave a statement in which he admitted that he was responsible for the victim's death but claimed that the initial shooting was accidental, occurring when his gun discharged when he confronted the victim about money she had stolen from him. His statement reads in pertinent part:

> I confronted [the victim] several times about my money and she kept denying it or that she had took [sic] it. It kept wearing on me heavy that she had took [sic] my money. On Sunday, the 13th of September, it had bothered me all day. My wife and I went to bed and when she went to sleep, I got up, eased out of bed and got my pistol. I walked around all the way to [the victim's] on foot. I got there, knocked on the door and she let me in. [The victim] walked around and sat on the couch facing the TV. I walked around in front of her and confronted her again about my money. I told her I needed my money and she said again that she didn't get it. I pulled out my pistol from my right front pants pocket and pointed it at her direction . . . . I said, "Even with this, are you going to deny getting my money?" Then the pistol went off. I had the hammer cocked and did not mean to shoot her. [The victim] went back over the couch and was in the floor in front of the front door. What [sic] I shot her I saw blood on her shirt, on her stomach over the left side. I stepped up on the couch and reached over and shot her in the top of the head. [The victim] fell

back and was laying [sic] on her back in front of the front door. I went on over the couch and shot her at least one more time. I just left her house and started back home. I think all this was around midnight. As I was walking home past Jimmy Pirtle's old house, a dog started barking at me. Somebody yelled back at the dog to come back and the dog left me alone. I just walked on home. I hid the gun first under an Oak chunk in the back yard and put my clothes in the junk room and went to bed. The next day I buried the pistol and my clothes in the dirt floor in the junk room. I buried my boots also. All that stuff is what Investigator Billy Davis found buried out there. I never told anyone but it has been bothering me.

Tennessee Bureau of Investigation ("TBI") Special Agent Forensic Scientist Lawrence James, who investigated the victim's murder, testified that he suspected a firearm was involved based on the nature of the victim's wounds. He did not, however, find any shell casings at her home, which led him to believe that the shooter either cleaned up the casings or used a revolver.

Harvey Vandiver, who lived on the same street as the defendant and the victim, testified that, at about 11:30 p.m. on September 13, 2009, he saw a person wearing "a toboggan and a black coat [and] black pants" walking down the street in front of his house. He said that his dog began barking, ran out into the street, and nipped the heels of the person, who "[j]ust kept walking with his head down," never saying anything.

Paul Lowery, a friend of Vandiver who was visiting him on the night of September 13, also saw the man walking down the road in front of Vandiver's house. He, like Vandiver, described the man as dressed in solid black, with a big coat and possibly a toboggan on his head, and agreed that the man never said anything to him, Vandiver, or Vandiver's dog after the dog nipped at his heels.

Joy Sipes, the defendant's wife, testified that her husband told her that he "had shot and killed [the victim]." She said he told her that he had walked both to and from the victim's house that night and had, between shots, felt the victim's pulse to "make sure she was dead." According to Mrs. Sipes, the defendant never said that the shooting was accidental. She testified that she was afraid of the defendant because he "wasn't himself anymore." After his confession, a friend of hers called the police for her, and she gave a statement to the police and drew a diagram to show officers where the defendant said he had shot the victim, "[r]ight in top of the head."

TBI Special Agent Ronnie Faulkner, who assisted in the investigation of the victim's death, testified that he and investigators from the sheriff's department canvassed the victim's

neighborhood and compiled a list of frequent visitors to her home, but none of the leads on the list helped them identify a suspect. However, on October 20, another investigator informed Agent Faulkner that the defendant's wife had come forward with some information. Agent Faulkner testified that he was present at the defendant's home when the defendant's buried clothes and the revolver were discovered. He said that the revolver found at the defendant's home contained four spent rounds and four live rounds and explained that shell casings remain in a revolver's chamber until manually ejected.

Kristie Cutler, the defendant's stepdaughter, testified that the defendant had sent her a letter from jail while he awaited trial asking her to "get up [on the witness stand] and lie for him." Ms. Cutler said that she was familiar with the defendant's handwriting and style of speaking and that she had no doubt that the letter had come from him. In the letter, the defendant set out some information, which he said "may or may not be true," that he wanted Ms. Cutler to "study on so [she would] be ready for trial." The defendant wrote that, on a previous occasion when he had been at the victim's house, the victim had slipped his billfold out of his back pocket and taken over $700.00. The letter then detailed the defendant's involvement in the victim's death:

> I told you she had stole [sic] my money . . . I was thinking at that moment about killing her. . . . Me and Joy had to go and borrow enough money to struggle and make it through the month. As time went by the more I thought of killing her. . . . I tried hard to put it out of my mind but I couldn't. Some nights while Joy was sleeping, I would lie there in bed planning it. The night it happened, it was after 1:00 in the morning on Sunday night. Joy had taken some Xanax and was sleeping good. I slipped out of bed, put dark clothes on, and got a pistol, and walked to her house. I knocked on the door. She was sitting watching T.V. All the lights [were] out. She came and let me in. She shut the door and went back and sat down. I went over and stood in front of her and said, "Anita, do you remember that day you stole me and Joy's money[?] She said, "I told you I didn't steal y'all's fucking money." I pulled out the pistol, told her I came to kill her. She tried to get away by crawling over the loveseat and jumped over the loveseat. I had one foot on the loveseat and the other on the floor and she fell on her ass and raised her arms up to stop, and I leaned over and shot her one time in the top of her head downward. Her eyes got stuck open. She laid back slow and I felt her pulse on her wrist. She was still alive. I shot her between the eyes. I felt her pulse again. She was still alive, and shot her in the heart and pulse stopped, dead.

Dr. Marco Ross, the medical examiner who performed the autopsy on the victim, testified that the cause of death was multiple gunshot wounds. He said that the victim had

a gunshot wound on the top of her head, a gunshot wound in which the bullet entered her lower lip and exited her right cheek, a gunshot wound on the "left side of her upper abdomen just below the ribcage area," a gunshot wound on her left forearm, a gunshot wound on her left lower abdomen, and a gunshot wound on her left thigh. Dr. Ross concluded that these findings were consistent with four shots having been fired, as the same shots that entered the victim's arm and thigh could have continued into her abdomen.

TBI Agent Steve Scott, an expert in firearms identification, testified that three intact bullets removed from the victim's body had been fired from the revolver that was found buried in the defendant's storage room.

The defendant testified that on September 13, he told his wife that he needed to confront the victim about his money. He said that his wife drove him to the victim's house and waited in the car while he confronted the victim. The victim let him into her home, and he asked her about the money. She denied having taken it, and he pulled out his pistol and cocked it "to scare her." The defendant said he only intended to scare the victim with the gun, but the gun discharged. He claimed that he remembered only the first shot and speculated that he had gone into an "alcohol blackout" after the first shot. He said that his wife was gone when he left the victim's house and that the following day, he buried the revolver and the clothes he had been wearing during the shooting. The defendant admitted that he had sent the letter his stepdaughter received and that no one had changed anything about it before it was read at trial.

## ANALYSIS

The sole issue that the defendant raises on appeal is whether the evidence was sufficient to sustain his conviction. Specifically, he argues that the evidence was insufficient for the jury to find that he premeditated the killing because the only proof of premeditation was contained in his confessions, which were not corroborated. The State responds by arguing that the evidence, which included proof that the defendant shot the unarmed victim multiple times and then hid the evidence, was sufficient for a rational jury to find the element of premeditation beyond a reasonable doubt. We agree with the State.

Where the sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn R. App. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the finding by the trier of fact beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v.

Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). The State should be afforded "the strongest legitimate view of the evidence in the record as well as all reasonable and legitimate inferences that may be drawn from the evidence." State v. Davidson, 121 S.W.3d 600 (Tenn. 2003).

A defendant may not be convicted based solely on a confession; some corroborating evidence is required. Smith v. United States, 348 U.S. 147, 152-153 (1954); State v. Smith, 24 S.W.3d 274, 281 (Tenn. 2000). However, while "[a]ll elements of the offense must be established by independent evidence or corroborated admissions," the threshold for corroborating evidence is low. Smith, 348 U.S. at 156. The State "needs 'only slight evidence . . . to corroborate a confession and sustain a conviction.'" Smith, 24 S.W.3d at 281 (quoting State v. Driver, 634 S.W.2d 601, 606 (Tenn. Crim. App. 1981)). The corroborating evidence will suffice "if of itself it tends to connect the defendant with the commission of the offense." Smith, 348 U.S. at 156; Ricketts v. State, 192 Tenn. 649, 654-55, 241 S.W.2d 604 (1951). Sufficient corroboration can be provided by circumstantial evidence alone. State v. Jones, 15 S.W.3d 880, 891 (Tenn. Crim. App. 1999).

First degree murder is "[a] premeditated and intentional killing of another[.]" Tenn. Code Ann. § 39-13-202(a)(1) (2006). "Premeditation" is defined in our criminal code as

> an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Id. § 39-13-202(d).

Whether premeditation exists in any particular case is a question of fact for the jury to determine based upon a consideration of all the evidence, including the circumstantial evidence surrounding the crime. See State v. Suttles, 30 S.W.3d 252, 261 (Tenn. 2000); State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997); State v. Pike, 978 S.W.2d 904, 914 (Tenn. 1998). Our supreme court has listed a number of factors which, if present, may support the jury's inference of premeditation. Among these are the defendant's declaration of an intent to kill the victim; the use of a deadly weapon upon an unarmed victim; the establishment of a motive for the killing; the particular cruelty of the killing; the infliction of multiple wounds; the defendant's procurement of a weapon, preparations to conceal the crime, and destruction or secretion of evidence of the killing; and the defendant's calmness

immediately after the killing. <u>State v. Jackson</u>, 173 S.W.3d 401, 409 (Tenn. 2005); <u>State v. Thacker</u>, 164 S.W.3d 208, 222 (Tenn. 2005); <u>State v. Leach</u>, 148 S.W.3d 42, 54 (Tenn. 2004); <u>State v. Nichols</u>, 24 S.W.3d 297, 302 (Tenn. 2000); <u>Bland</u>, 958 S.W.2d at 660.

Viewed in the light most favorable to the State, the evidence establishes that the defendant dressed himself in dark clothing; armed himself with a weapon; traveled to the victim's home; confronted the unarmed victim over the money he believed she had stolen from him; fired multiple gunshots into her body, causing her death; and then calmly walked home, where he hid the murder weapon and his clothing in the dirt beneath his storage room. Afterwards, the defendant informed his wife of the killing, telling her that he had shot the victim to death and that he had checked her pulse between shots to find out if she was still alive. The defendant also gave a confession to police in which he described his obsession with the money that the victim had taken from him, how he had confronted her several times about it, how he had gone to her home with a gun to confront her a final time, and how he had stepped over the couch and shot her in the top of the head after his gun discharged the first time. Finally, the defendant confessed in his letter to his stepdaughter that he had first told the victim he had come to kill her and then shot her multiple times, checking between shots to determine whether she still had a pulse. From all this evidence, a rational jury could have reasonably inferred that the defendant premeditated the killing. We, therefore, affirm the defendant's conviction for first degree premeditated murder.

## <u>CONCLUSION</u>

Based on the foregoing authorities and reasoning, we affirm the judgment of the trial court.

_____
ALAN E. GLENN, JUDGE
