IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs June 4, 2013

## STATE OF TENNESSEE v. ERIC BLEDSOE

**Appeal from the Criminal Court for Shelby County**
**No. 0906393    Chris Craft, Judge**

**No. W2012-01643-CCA-R3-CD  - Filed July 31, 2013**

Eric Bledsoe ("the Defendant") was convicted by a jury of aggravated rape, aggravated burglary, and theft of property over $1000.  Following a sentencing hearing, the trial court sentenced the Defendant to an effective sentence of sixty-five years' incarceration. On appeal, the Defendant challenges the sufficiency of the evidence regarding his conviction for aggravated rape.  After a thorough review of the record and the applicable law, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment**
**of the Criminal Court Affirmed**

JEFFREY S. BIVINS, J., delivered the opinion of the Court, in which THOMAS T. WOODALL and JAMES CURWOOD WITT, JR., JJ., joined.

Stephen Bush, Chief Public Defender and Harry E. Sayle III, Assistant Public Defender, Memphis, Tennessee, for the appellant, Eric Bledsoe.

Robert E. Cooper, Jr., Attorney General & Reporter; Amy Weirich, District Attorney General; Marianne L. Bell, Assistant District Attorney; and Clarence E. Lutz, Assistant Attorney General, for the appellee, State of Tennessee.

## OPINION

### Factual and Procedural Background

On October 8, 2009, a Shelby County Grand Jury indicted the Defendant on one count of aggravated rape by causing bodily injury, one count of aggravated burglary, and one count of theft of property over $1,000.  The Defendant was tried by a jury on April 16, 2012, and the following proof was adduced:

C. O.[1] ("the victim") testified that the incident took place on May 18, 2009. At the time, she was residing in a townhome at 303 Bishop Drive, Memphis, Tennessee. The previous night the victim left her downstairs kitchen window partially open. She awoke at approximately 5:00 a.m. to what she described as a "creeping noise." The victim initially thought the noise was her young son moving around the house, but when she looked out of her bedroom door, she saw a man on all fours just outside her bedroom. The intruder was dressed in a brown denim jacket, jeans, a red baseball cap with an "A" on it, and a "dewrag." At trial, the victim identified the Defendant as the intruder who entered her home that night.

The victim testified that she did not react immediately upon seeing the Defendant because she was in shock. When the Defendant realized he had been seen by the victim, he stood up, entered the bedroom, turned the lights on, and stood over the victim's bed. The Defendant told the victim, "I'm not going to hurt you. I want some." The victim understood his words to mean he "wanted sex," and she immediately began kicking and hitting him. In response, the Defendant placed both hands around the victim's neck and choked her until she was unconscious. When the victim regained consciousness, the Defendant was gone, and she noticed that her underwear had been pushed to the side.

After rearranging her underwear, she went to her son's room to make sure he was unharmed, and from her son's window she saw that her vehicle was missing. The victim then went downstairs to check the rest of her home and discovered that her car keys, student identification, some money, and her driver's license were missing from her purse. She noticed her kitchen window was completely open, and the screen over the kitchen window was missing. The victim called her mother and 911. After police arrived at the scene, the victim was transported to the Memphis Sexual Assault Resource Center[2] ("the Rape Crisis Center"), where Dr. Amanda Taylor conducted a full physical examination of the victim. The victim's injuries were photographed, DNA samples were taken for a rape kit, and she was given a Plan B pill.[3] The underwear the victim had been wearing during the incident was kept by the Rape Crisis Center as part of the rape kit. After leaving the Rape Crisis Center, the victim worked with a sketch artist to create a composite picture of her attacker, and she also gave a statement to police.

_____

[1] It is the policy of this Court not use names of victims of sexual crimes.

[2] The Memphis Sexual Assault Resource Center was renamed "the Shelby County Rape Crisis Center" sometime after the attack.

[3] A Plan B pill is used "to prevent pregnancy following unprotected intercourse or contraceptive failure." *Plan B Definition*, MERRIAM-WEBSTER.COM, http://merriam-webster.com/medical/plan%20b (Last visited June 27, 2013)

On cross-examination, the victim denied knowing the Defendant prior to the attack. When questioned about why she failed to state, in a written statement made during a photo identification three days after the crime, that the Defendant had assaulted or sexually assaulted her, the victim testified that she still was too distraught and that she already had told the police that she had been sexually assaulted.

Dr. Amanda Taylor, a sexual assault nurse examiner at the Rape Crisis Center, testified as an expert witness in forensic nursing and sexual assault examinations. The victim arrived at the Rape Crisis Center at 9:30 a.m. on May 18, 2009. Dr. Taylor explained that the procedure following a victim's arrival at the Rape Crisis Center is to first talk to the patient with an advocate present, then to do a full physical examination, collect "labs," administer medications, and collect a rape kit. Any injuries a victim might have are photographed. In this case, the victim had injuries both to her neck and thighs, and they were fresh injuries at the time of the physical examination. The victim also had a genital examination, which involved both an internal and external examination. The victim did not have any injuries to her genitals. Dr. Taylor testified that women commonly do not have any genital injuries after being sexually assaulted and that 80% of sexual assault victims do not show injuries in their genital area. Dr. Taylor collected a rape kit consisting of four swabs from the victim's mouth for baseline DNA, four swabs from the "vulvar area," and four swabs from the internal genital area. The kit also included the victim's underwear. Dr. Taylor testified that, after a kit has been collected, all of the evidence is sealed and sent to the Tennessee Bureau of Investigation ("TBI") for analysis. The kits are kept in a secure location until they are transported to the TBI.

On cross-examination, Dr. Taylor explained that the advocate who is present during the initial interview at the Rape Crisis Center is there to explain to a victim the legal proceedings involved. The advocate is not present for the medical exam. Dr. Taylor confirmed that the victim did not have any injuries to her genitals and that she could neither confirm nor negate sexual abuse had taken place. The victim's statement taken at the Rape Crisis Center did not include anything about her underwear being awry after she recovered from unconsciousness. On redirect, Dr. Taylor confirmed the victim's injuries were consistent with the statement the victim gave at the Rape Crisis Center.

Dyane Karl, a forensic technician with TBI, testified that it is her job to receive and label evidence and then place it in the TBI's vault until it is ready to be analyzed. Karl testified that the TBI will not accept evidence that is either unsealed or not delivered by law enforcement. She received the sealed rape kit taken from the victim's examination from

Hyun Kim, a Memphis Police Department ("MPD") officer.[4]  Karl testified that Francesca Sanders, who also worked as a forensic technician at TBI, received the DNA standard swabs of the Defendant from Officer Kim.

Donna Nelson, a special agent forensic scientist assigned to the serology DNA unit with the TBI, testified as an expert witness in the area of DNA analysis.  Her job at the TBI was to process evidence for DNA and test any DNA evidence for possible matches.  After receiving the rape kit, Special Agent Nelson first tested the vaginal swabs for the presence of semen.  The vaginal swabs tested negative for the presence of semen.  The vulvar swabs were then tested for the presence of alpha amylase, an ezyme found in saliva.  The tests returned positive results for the presence of alpha amylase.  Because alpha amylase is found in other substances, its presence only indicates the possibility of the presence of saliva, and is not conclusory.  The victim's underwear tested positive for the presence of semen, on the inside of the underwear, in the "front of the crotch area."   After these tests were performed, the evidence was returned to the TBI's evidence vault, and Special Agent Nelson requested a DNA standard from the Defendant.  The semen found on the victim's  underwear was matched to the Defendant's DNA.  Dr. Taylor's report on the DNA test results stated that the "probability of an unrelated individual having the same DNA profile from either the African American, Caucasian, Southeastern Hispanic or Southwestern Hispanic population exceeds the current world population."

Marvin Pender, a supervisor at Memphis Police Communications, testified that the victim made an emergency call on May 18, 2009.  His testimony was based on a 911 chronology record.  The dispatcher initially classified the call  as a "prowler call," but after talking with the victim, the dispatcher discovered the victim was sexually assaulted, and the call was changed to criminal assault.  A dispatch to the victim's home was made at 5:37 a.m.

Officer James Henderson of the MPD responded to the victim's 911 call first.  The victim told Officer Henderson that she had been sexually assaulted and that she suspected the intruder had entered her home through the open kitchen window.  Officer Henderson observed that the window was open and that its screen was on the ground outside.  He also noticed injuries on the victim's arm and neck. Officer Henderson took a description of the victim's assailant, and noted that her car, keys, and student identification had been stolen.

Officer David Galloway, a crime scene unit officer with the MPD, photographed the crime scene and processed the kitchen window's sill for fingerprints.  He also processed the window screen and sent it to the crime lab to be dusted for fingerprints.  The screen was not

---

[4] Officer Kim's first name is spelled as both "Hyun" and "Yon" in the record, but "Hyun" appears to be the correct spelling.

processed at the scene because Officer Galloway determined that, due to the nature of the window screen, better fingerprints could be obtained in the crime lab.

Sergeant Roger Wheeler of the MPD was a part of crime scene investigation at the time of the incident. He obtained three fingerprints from the window screen, and sent those fingerprints to be examined by a latent print examiner.

Officer Archie Rudd of the MPD received a call over his radio to be on the lookout for the victim's Jeep. A vehicle matching the description was located on the lot of a Mapco. A witness at the scene informed Officer Rudd that a black male had been attempting to change the tire on the vehicle. The Jeep was still on a jack when officers arrived on the scene, and a tire was pushed under the vehicle. After talking to witnesses, Officer Rudd then went to a nearby McDonald's. He attempted to use the restaurant's surveillance cameras to identify the suspect and also located another tire from the Jeep in a dumpster behind the McDonald's. Officer Rudd then returned to the Jeep and had it towed to the city impound lot. Officer Rudd testified that either he or his trainee was the one to fill out the paper work for towing the Jeep. Officer Rudd testified that he stands over his trainees' shoulders and makes sure any paperwork they fill out is correct.

Sergeant Ricky Davison of the MPD testified that he processed the victim's Jeep after it was towed. He photographed the vehicle and also dusted the exterior for fingerprints. The photographs were taken before and after he dusted the outside. Sergeant Davison found fingerprints on the exterior of the passenger door. The Jeep's rear view mirror had been torn off, and it was located on the rear passenger floorboard. Sergeant Davison obtained fingerprints from the rear view mirror.

Martin Milner, a civilian employee of the MPD's crime scene investigation latent print unit, testified as an expert in latent print examination. Milner received all of the fingerprint evidence collected by MPD officers from the crime scene and from the victim's Jeep. Milner determined that seven of the fingerprints collected by law enforcement officers were "of value." The fingerprints of value were then compared to known fingerprints using the automated fingerprint identification system ("AFIS"), a computerized database of known fingerprints. The AFIS returned a single identification number, 248804, as a match to the fingerprints taken from the crime scene. This number had previously been assigned to the Defendant. Milner manually compared the fingerprints after they were scanned using the AFIS. Two fingerprints from the torn rear view mirror matched a known print of the Defendant on more than ten points of comparison. A thumb print taken from the victim's window screen matched the Defendant's known fingerprint on seven points of comparison. A palm print taken from the passenger door of the victim's vehicle matched the Defendant on six points of comparison. Milner testified that he preferred not to make a comparison

with less than five points of comparison matching and that he felt very comfortable in saying there was a match when seven points of comparison matched. He did not like "to go below five" points of comparison when identifying matching fingerprints.

On cross-examination, Milner confirmed his preferences for the number of matching points when making an identification. Milner stated that he would still report an identification between fingerprints when only four points matched but explained that four matching points neither confirmed nor negated a match.

Debra Finley, a fingerprint technician working for the Shelby County Sheriff's Office, testified as an expert witness in fingerprint identification. She testified that fingerprints taken from the Defendant the day of the trial were the "exact same" as the fingerprints already on file for the Defendant on between seven to ten different comparison points. The file number attached to the previously known fingerprints was 248804. The comparisons were made using the right thumb print and the right index finger. On cross-examination, she admitted there are more than ten points for comparison when identifying fingerprints.

Mark Workman, a composite layout artist with MPD's photo laboratory, testified that he developed a sketch of the victim's assailant during an interview with the victim in his office based on the description given to him by the victim. Workman's process is to begin creating a sketch using a description given to him without looking at photographs. He continuously shows the image to whoever is describing the person until they do not wish to make any more changes. Once the picture is complete, it is sent to the investigating officer.

Lieutenant Angela Smith of the MPD was the lead investigator on the case. At the time of the investigation, she held the rank of sergeant. Lieutenant Smith responded to the victim's home, and she also responded when the victim's Jeep was found. She took the victim's statement after she had been examined at the Rape Crisis Center, and she was also responsible for circulating the composite sketch of the suspect. After the fingerprints taken at the crime scene and from the Jeep were matched to the Defendant's fingerprints, Lieutenant Smith created a photo array that included a photo of the Defendant and presented it to the victim. The victim identified the Defendant from the photo array.[5]

After the Defendant was arrested, Lieutenant Smith interviewed him, took his statement, and obtained a DNA swab. Lieutenant Smith testified that the Defendant was

_____

[5] The photograph of the Defendant included in the array was from a previous arrest. The trial judge ruled that, while the photo array was admissible, the jury could not be informed how Lieutenant Smith obtained the photo of the Defendant.

aware of his rights when he gave his statement. The Defendant's statement included the following:

> I open the window up went in and I was looking around and I went upstairs and in this room and when I got in the room the lady woke up and I start talking to her asking her questions and stuff and when I got in the room I seen [sic] her butt naked then I started talking to her asking where her boyfriend was and what she was doing naked. Then she told me he had just left then we were still talking and I asked her if she could give me a few dollars to get something to eat cause I was high then she started screaming and stuff and I told her don't be yelling cause [sic] I wasn't going to do anything to her and then yelling and kicking and then she kicked me in my stomach and I grabbed her leg and tried to calm her down then she swung at me so after that I opened her legs up and had sex with her but I took it out before I had ejaculated. I took it out and did it on the bed I didn't have a condom on when I left out of there I got her keys from off the table and drove off.

When the Defendant was asked if there was anything else he wanted to add to his statement, he stated, "I really apologize for what I did because I wasn't in my right mind, I sorry [sic] I did [sic] her like that that is not me."

Officer Andy Hurst of the MPD worked in the sex crimes division at time of the incident. He was asked by then-sergeant Smith to help her take a statement from the Defendant. Officer Hurst testified that the Defendant never appeared to be confused, "out of his mind," under the influence, or uncooperative during his police interview. At one point during the interview, the Defendant asked Lieutenant Smith to leave the room. After she had left the interview room, the Defendant immediately began crying and stated it "wasn't like him" to do what he had done. The Defendant blamed his actions on the "pills and alcohol" that he had consumed. After this admission, Officer Hurst determined it would be best to get a statement from the Defendant, and he notified Lieutenant Smith to return to the interview room so they could take the Defendant's statement. On-cross examination, Officer Hurst testified that the statements the Defendant made while Lieutenant Smith was absent from the room were not included in his written statement because they were "covered in the narrative."

The Defendant did not testify, and the defense did not call any witnesses.

The jury convicted the Defendant of one count of aggravated rape, one count of aggravated burglary, and one count of theft of property over $1,000. After a subsequent hearing, the trial court sentenced the Defendant to an effective term of sixty-five years in the

Tennessee Department of Correction. The trial court denied the Defendant's timely-filed motion for new trial, and the Defendant timely filed his notice of appeal. The only issue raised on appeal by the Defendant is the sufficiency of the evidence supporting his rape conviction on the element of penetration.

## Analysis

### *Sufficiency of the Evidence*

Our standard of review regarding sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e). After a jury finds a defendant guilty, the presumption of innocence is removed and replaced with a presumption of guilt. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992). Consequently, the defendant has the burden on appeal of demonstrating why the evidence was insufficient to support the jury's verdict. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

The appellate court does not weigh the evidence anew. Rather, "a jury verdict, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts" in the testimony and all reasonably drawn inferences in favor of the State. State v. Harris, 839 S.W.2d 54, 75 (Tenn. 1992). Thus, "the State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom." Id. (citation omitted). This standard of review applies to guilty verdicts based upon direct or circumstantial evidence. State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (citing State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). In Dorantes, our Supreme Court adopted the United States Supreme Court standard that "direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." Id. at 381. Accordingly, the evidence need not exclude every other reasonable hypothesis except that of the defendant's guilt, provided the defendant's guilt is established beyond a reasonable doubt. Id.

As charged in this case, aggravated rape is defined as the "unlawful sexual penetration of a victim by the defendant" and the defendant "causes bodily injury to the victim." Tenn. Code Ann. § 39-13-502(a)(2) (2006). The Defendant contends that the State failed to prove the element of penetration, arguing that no rational jury could have found that he penetrated

the victim because it is clear from his confession and the physical evidence that the Defendant only engaged in "frottage"[6] with the victim.

We disagree. The State presented evidence that the victim's underwear had been moved to the side and that the Defendant's semen was found on the inside of the victim's underwear. The Defendant confessed that he "opened her legs up and had sex with her but [he] took it out before [he] ejaculated." If there are ambiguities in this statement, the jury resolved those in the State's favor when it returned a verdict of guilty on the aggravated rape count. The jury found that penetration took place during the crime, and this Court will not disturb inferences drawn by the jury. See State v. Winters, 137 S.W.3d 641, 655 (Tenn. Crim. App. 2003).

To the extent that the Defendant's argument could be interpreted to raise a corpus delicti argument, any such argument also fails. A defendant cannot be convicted on his or her confession alone. See Ashby v. State, 139 S.W.2d 872, 875 (Tenn. 1991). "The '*corpus delicti*' refers to the 'body of the crime – evidence that a crime was committed at the place alleged in the indictment.'" State v. Banks, 271 S.W.3d 90 (Tenn. 2008) (quoting Van Zandt v. State, 402 S.W.2d 130 (1966)). "[T]he State must present some corroborating evidence to establish the corpus delicti." Id. (citing State v. Smith, 24 S.W.3d 274, 281 (Tenn. 2000)). When a defendant confesses to a crime, the corroborating evidence "'need not be as convincing as the evidence necessary to establish a corpus delicti in the absence of any confession.'" State v. Housler, 193 S.W.3d 476, 490 (Tenn. 2006) (quoting Ricketts v. State, 241 S.W.2d 604, 606 (1951)). The State need present "only slight evidence . . . to corroborate a confession and sustain a conviction." Smith, 24 S.W.3d at 281 (quoting State v. Driver, 634 S.W.2d 601, 606 (Tenn. Crim. App. 1981)). "Whether the [S]tate has sufficiently established the *corpus delicti* is primarily a jury question." State v. Jones, 15 S.W.3d 880, 891 (Tenn. Crim. App. 1999). "All elements of the *corpus delicti* may be established by circumstantial evidence." State v. Garmon, 972 S.W.2d 706, 708 (Tenn. Crim. App.1998) (citing Clancy v. State, 521 S.W.2d 780 (Tenn. 1975)).

The Defendant argues that there is no evidence of penetration other than his statement made to law enforcement officers that he had sex with the victim. The State, however, did present evidence that the victim's underwear had been moved to the side and that the Defendant's semen was on the inside of her underwear. This evidence clearly rises to the "slight evidence" requirement of our case law and is sufficient to corroborate the corpus delicti. We note also that corroboration is primarily a jury question, see Jones, 15 S.W.3d at 891, and the jury resolved this question in favor of the State.

---

[6] In this case, we understand "frottage" to mean that the Defendant rubbed his penis on the victim, as opposed to engaging in intercourse.

We hold that the evidence is sufficient to support the Defendant's conviction of aggravated rape and that the Defendant is not entitled to relief on this basis.[7]

## CONCLUSION

For the reasons set forth above, we affirm the judgment of the trial court.

_____
JEFFREY S. BIVINS, JUDGE

---

[7] We again note that the Defendant only challenges the sufficiency of the evidence as to the element of penetration. Therefore, we need not address the other elements of this offense.